

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00052-CR

_____

MARTIN SUAREZ JUAREZ, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 195th District Court
Dallas County, Texas
Trial Court No. F-1360355-N

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Burgess

O P I N I O N

The State charged Martin Suarez Juarez with assault family violence against Juana Morcia, the mother of his child.[1] *See* TEX. PENAL CODE ANN. § 22.01(b)(2)(B) (West Supp. 2014). The jury found Juarez guilty and sentenced him to eight years' imprisonment. On appeal,[2] Juarez (1) argues that the trial court erred in overruling his objection during voir dire to the State's allegedly improper commitment question, (2) brings five points of error complaining of several of the trial court's evidentiary rulings, and (3) argues that the written judgment of conviction lists the incorrect statute of offense. Because we find that the trial court did not abuse its discretion in either overruling Juarez' objection during voir dire or in deciding the evidentiary issues which Juarez actually preserved, we overrule Juarez' first six points of error. However, we modify the judgment to reflect that Juarez was convicted under Section 22.01(b)(2)(B) of the Texas Penal Code and affirm the trial court's judgment, as modified.

**I.     The Trial Court Did Not Abuse Its Discretion in Overruling Juarez' Objection During Voir Dire**

**A.     Background**

During voir dire, the State engaged in the following conversation with several venire members regarding the State's evidentiary burden:

> [BY THE STATE]: . . . . So correct me if I'm wrong. But what I hear you saying that if, for example, it's just a he-said-she-said type of deal that that would not be sufficient for you; that you would require that the State bring something

---

[1]Specifically, Juarez was charged with assault family violence by impeding the normal breathing or circulation of the blood of Morcia by applying pressure to her throat or neck and by blocking her nose or mouth.

[2]Originally appealed to the Fifth Court of Appeals in Dallas, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We follow the precedent of the Fifth Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

else -- another witness, some DNA, something else other than the word of one person against another.

THE VENIREPERSON: Yes.

[BY THE STATE]: Are you saying that you would require the State of Texas to prove its case in a particular manner? In other words, something more than just one person?

THE VENIREPERSON: Yes.

[BY THE STATE]: Okay. Anybody else in the second row? . . . .

THE VENIREPERSON: I would have to see bodily injury as opposed to just judging somebody on credibility, on what he said and what she said.

[BY THE STATE]: Okay. Sure. I just want to make sure we're all on the same page here. You understand that bodily injury is defined legally as physical injury, illness or impairment of the physical condition.

THE VENIREPERSON: Right.

[BY THE STATE]: You understand that could mean [that there] are no visible injuries on someone. That's what the law says. What I hear you telling me that even though that's what the law says, you're not comfortable with that. You would need to see some type of blood or guts or something more serious than maybe just physical pain and that you would require the State of Texas to prove something more than what is required under the law. Is that what you're saying?

THE VENIREPERSON: Correct.

. . . .

Due to the seriousness of this and the allegations, yes, I would need more; some type of physical evidence.

[BY THE STATE]: And again I'm just going to kind of cover the same thing. You understand what the law requires.

THE VENIREPERSON: Yes, ma'am.

3

> [BY THE STATE]: And what you're telling me is that that is not sufficient for you in this case?
>
> THE VENIREPERSON: Correct.
>
> . . . .
>
> [BY THE STATE]: Anybody in the second row feel like some of you feel already? How about Mr. Thompson?
>
> THE VENIREPERSON: Talking about choking somebody, if we're talking about choking, I would like to see a bruise or something rather than she said he choked me.
>
> [BY THE STATE]: Now, you understand Mr. Thompson that the law requires that we show evidence that bodily injury was sustained through -- we're going to call it choking because that whole long definition is too long to repeat. You understand we have to prove that to you beyond a reasonable doubt. And are you telling me you would require that proof to be in the form of some type of bruising?
>
> THE VENIREPERSON: Yes.

The State then asked the following question of Venireperson Thompson, which prompted an objection from Juarez' trial counsel:

> [BY THE STATE]: And if that bruising wasn't there, then you would be inclined to find somebody not guilty --
>
> [BY THE DEFENSE]: Judge, I'm going to object as to that being a commitment question.
>
> THE COURT: Overruled.
>
> [BY THE STATE]: You would require the State to prove more than what is required under the law?
>
> THE VENIREPERSON: Yes.

Juarez contends that the State asked an improper commitment question.

4

## B. Standard of Review

In *Standefer v. State*, 59 S.W.3d 177 (Tex. Crim. App. 2001), the Texas Court of Criminal Appeals established the test for determining whether a question is an improper commitment question: (1) whether the question is a commitment question; (2) if so, whether the commitment question gives rise to a valid challenge for cause; and (3) if it does, whether the question adds facts beyond those necessary for a challenge for cause. *Id.* at 179–84; *see also Lee v. State*, 206 S.W.3d 620, 621–23 (Tex. Crim. App. 2006). Improper commitment questions are prohibited in order "to ensure that the jury will listen to the evidence with an open mind—a mind that is impartial and without bias or prejudice—and render a verdict based upon that evidence." *Sanchez v. State*, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005). The trial court's ruling is reviewed under the abuse of discretion standard. *Fuller v. State*, 363 S.W.3d 583, 585 (Tex. Crim. App. 2012) (citing *Sells v. State*, 121 S.W.3d 748, 756 (Tex. Crim. App. 2003)); *see Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002).

## C. Analysis

We first determine whether the question is a commitment question. *Standefer*, 59 S.W.3d at 179; *Braxton v. State*, 226 S.W.3d 602, 604 (Tex. App.—Houston [1st Dist.] 2007, pet. dism'd, untimely filed). A commitment question "'attempt[s] to bind or commit a prospective juror to a verdict based on a hypothetical set of facts.'" *Standefer*, 59 S.W.3d at 179 (quoting *Allridge v. State*, 850 S.W.2d 471, 480 (Tex. Crim. App. 1991)). Commitment questions "require a venireman to promise that he will base his verdict or course of action on some specific set of facts before he has heard any evidence, much less all of the evidence in its proper context."

5

*Sanchez*, 165 S.W.3d at 712. Finally, a question is a commitment question "if one or more of the possible answers is that the prospective juror would resolve or refrain from resolving an issue in the case on the basis of one or more facts contained in the question." *Standefer*, 59 S.W.3d at 180.

Here, the State does not challenge Juarez' contention that the question was a commitment question. The question "if bruising wasn't there, then you would be inclined to find somebody not guilty" has two possible answers, "yes" or "no." A yes answer would resolve the issue of guilt based upon the absence of bruising alone. Consequently, "one . . . of the possible answers is that the prospective juror would resolve . . . an issue in the case on the basis of . . . facts contained in the question," and the question is a commitment question. *See Delacerda v. State*, 425 S.W.3d 367, 382 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (finding question asking whether jury members could convict defendant in absence of physical evidence to be commitment question).

Next, we consider whether the question gave rise to a valid challenge for cause. "[J]urors must be open-minded and persuadable, with no extreme or absolute positions regarding the credibility of any witness." *Ladd v. State*, 3 S.W.3d 547, 560 (Tex. Crim. App. 1999). A veniremember may be challenged for cause if he "has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment." TEX. CODE CRIM. PROC. ANN. art. 35.16(b)(3) (West 2006); *see Delacerda*, 425 S.W.3d at 382. "The State may properly challenge a prospective juror for cause when the juror would hold the State to a burden

6

higher than beyond a reasonable doubt." *Delacerda*, 425 S.W.3d at 382 (citing *Mason v. State*, 116 S.W.3d 248, 255 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd)).

The Texas Penal Code defines "bodily injury" as "physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(a)(8) (West Supp. 2014). During voir dire, the State explained that the term "bodily injury" included any type of physical pain and inquired whether the prospective jurors would be able to find the bodily-injury element in this case without physical evidence, prompting Thompson's reply. The State's question to Thompson was designed to demonstrate that Thompson would require physical evidence in addition to testimony to establish bodily injury. Thus, we find that the answer would give rise to a proper challenge for cause. *See Delacerda*, 425 S.W.3d at 382 (citing *Blackwell v. State*, 193 S.W.3d 1, 20 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) ("[A] juror who would require more evidence than necessary to prove a case beyond a reasonable doubt would be subject to a challenge for cause."); *Harris v. State*, 122 S.W.3d 871, 880 (Tex. App.—Fort Worth 2003, pet. ref'd) ("Although the State may not bind a prospective juror to a specific set of facts, the State is permitted to determine whether a prospective juror will require evidence the law does not require to convict a defendant.")); *see also Kaiser v. State*, No. 05-07-00575-CR, 2008 WL 2611367, at *2 (Tex. App.—Dallas July 3, 2008, pet. ref'd) (not designated for publication).[3]

Finally, we must determine whether the question "contain[s] only those facts necessary to test whether a prospective juror is challengeable for cause." *Standefer*, 59 S.W.3d at 182. *Standefer* established the rule that a commitment question is improper when "the *State's* question

---

[3]Although unpublished cases have no precedential value, we may take guidance from them "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

7

suppli[es] facts beyond what [i]s necessary to sustain a challenge for cause." *Id.* (emphasis added); *see Braxton*, 226 S.W.3d at 604. As a preliminary matter, the record clarifies that Thompson supplied the additional facts that in addition to victim testimony, he would require physical evidence such as bruising in order to find the bodily-injury element. Accordingly, the State's question was not based on facts interjected by it, but on the hypothetical facts interjected by Thompson. *See Avila v. State*, No. 05-13-00673-CR, 2014 WL 5475459 (Tex. App.—Dallas 2014, no pet.) (mem. op., not designated for publication). Therefore, the State did not add more facts than were "necessary to test whether a prospective juror is challengeable for cause." *Standefer*, 59 S.W.3d at 182.

Yet, even if the State had interjected bruising into the question by responding to Thompson's answer, the question was not an improper commitment question because its objective was proper—to find jurors who would not follow the law and challenge them for cause. In *Sanchez*, the Court of Criminal Appeals held that legitimate voir dire questions seek "to elicit information which would establish a basis for a challenge for cause" and "to facilitate the intelligent use of peremptory challenges." *Sanchez*, 165 S.W.3d at 710–11. The court also identified the specific harm created by improper commitment questions, namely, "indoctrinat[ing] the juror on the party's theory of the case" to such an extent that "the jury or any specific juror [is] 'poisoned' by the State's improper commitment questions on a legal issue or fact that [is] important to the determination of the verdict or sentence." *Id.* at 711, 713.[4]

---

[4]Justice Womack stated in his concurring opinion, "I feel sure that no member of the Court thinks that 'indocrinat[ing] the jurors' is a legitimate purpose [of voir dire]." *Sanchez*, 165 S.W.3d at 715 (Womack, J., concurring).

8

Thus, the ultimate issue is whether the question's objective is proper or improper, i.e., whether the question seeks information to support the exercise of a challenge for-cause or peremptory challenge or merely attempts to indoctrinate the veniremembers on the party's theory of the case.

In the present case, the State theorized that Juarez assaulted Morcia by choking her. The law did not require the State to show evidence of bruising in order to convict. The objective in asking the question was not to convince veniremembers to convict Juarez without evidence of bruising, but to identify those jurors who would never convict in the absence of bruising so they could be challenged for cause. Obtaining a commitment from jurors that they would not acquit simply because of a lack of bruising, regardless of the evidence, did not foreclose the jury's options to acquit Juarez for any other legitimate reason, such as witness credibility or weight of the evidence. Accordingly, the State did not seek to indoctrinate Venireperson Thompson or any other juror to convict Juarez on any particular evidence, but rather sought to determine if the venire member could follow the law by not requiring the State to prove more than was legally required. We overrule Juarez' first point of error.[5]

## II. There Was No Abuse of Discretion in the Trial Court's Evidentiary Rulings

Juarez next argues that the trial court abused its discretion (1) in overruling his objection to the responding police officer's testimony about the 9-1-1 dispatcher's comments, (2) in overruling his hearsay objection to the police officer's testimony about the victim's statements, (3) in overruling his relevance objection to the officer's testimony that the Dallas Police

---

[5]As demonstrated by the voir-dire excerpts, Thompson did not answer the question of which Juarez complains. Instead, after Juarez' objection, the State modified its question to omit the specific facts that Thompson had interjected into the voir dire.

Department places importance on family violence cases, (4) in overruling his hearsay objection to an investigator's testimony regarding his previous aliases and immigration hold during punishment, and (5) in allowing a Dallas County District Attorney's Office investigator's speculative testimony about Juarez' immigration status. "A trial judge's decision on the admissibility of evidence is reviewed under an abuse of discretion standard and will not be reversed if it is within the zone of reasonable disagreement." *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011) (citing *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010); *Russeau v. State*, 291 S.W.3d 426, 438 (Tex. Crim. App. 2009)).

### A.  The Victim's Trial Testimony

Morcia was the State's first witness at Juarez' trial. Morcia testified that on the night of the incident, she accidentally locked herself out of her home in the middle of the night and went to Juarez' apartment with their daughter to sleep. She laid in Juarez' bed while he lulled the child to sleep. Morcia testified when he returned to bed that she smelled alcohol on his breath and realized, for the first time since she had arrived, that he was drunk. She promptly told him that she would leave. According to Morcia, Juarez then threatened to rape her and attempted to force himself on her. As Morcia tried to escape, Juarez grabbed her hair, took off her clothes, and threw her on the bed. Morcia testified,

> He was pulling my hair and then he grabbed my neck. He took it really hard and then he would squeeze and then he let go. He grabbed me again and I wasn't breathing. I couldn't breathe. And I think I was shouting. I was so desperate. And I -- I looked for his face and was hitting him with my hand and hitting him with my hand for him to let me go. . . . He was looking at me with a violent, aggressive look. I didn't recognize him. And I didn't think I was going to get out of there with my life.

10

In order to free herself, Morcia hit Juarez with her hands and feet. She testified that Juarez let her go, slapped her face, and walked away toward the kitchen.

After this attack subsided, Morica woke the child and was about to leave when Juarez again pulled her by the hair and cursed at her. According to Morcia, the child, who was five years old at the time of trial, asked Juarez to calm down and let them go. Morcia testified that Juarez grabbed her by the shirt and prevented her from leaving after they both heard police sirens approaching.

Without objection, the State introduced photographs of Morcia taken immediately after the incident. The photographs showed that Morcia's shirt had been ripped at the collar and that the shirt's neckline had been stretched downward. Morcia testified that the shirt had been damaged when Juarez removed it from her by force. When asked to show whether the photographs depicted evidence of the choking, Morcia testified, "You practically can't see it, but he was squeezing me tight."

## B. There Was No Abuse of Discretion in Overruling Objections to the Officer's Testimony

### 1. Juarez Failed to Preserve Complaint Relating to Officer's Testimony about Dispatcher Comments

As its second witness, the State called Courtney Collins, an officer with the Dallas Police Department. Collins testified, "We responded to a call off of Forest Lane in regards to an independent caller who was not either the complainant or . . . the arrested person. There was another person that was at the apartment with them who made the 9-1-1 call but didn't have anything to do with it." Collins then said, "The comments were that he heard, a man and woman

11

arguing." Juarez immediately interposed a general, unspecified objection that the trial court overruled.

On appeal, Juarez argues that the trial court erred in allowing Collins to testify about the dispatcher's comments because (1) the 9-1-1 caller did not testify and (2) the statement constitutes hearsay.[6] Yet, without further objection, Collins testified to the following:

> The computer lets you know what type of call you're getting, which I told you family violence calls says major disturbances. It gives you the time of the call, who made the call, and gives you some comments. Usually when you call in to 9-1-1, it will say do you have an injury and what the emergency will be. They try to keep you on the line as long as they can, too. The comments on the call, which I stated earlier stated that someone called and they had heard a male and female arguing. And the female was screaming, Let me go, let me go.
>
> Sometimes callers are anonymous and they refuse. But his name is Byron Martinez. And that was our caller.

Also, the 9-1-1 call in which Martinez made the statements Collins referred to during her testimony was later admitted into evidence and played for the jury, both without objection.

"To preserve error, it has been consistently held that one must object each and every time inadmissible evidence is offered." *Long v. State*, 10 S.W.3d 389, 399 (Tex. App.—Texarkana 2000, pet. ref'd) (citing *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991)); *see Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Martin v. State*, 151 S.W.3d 236, 240 (Tex. App.—Texarkana 2004, pet. ref'd). "Where a party fails to make a timely objection

---

[6]To preserve error, a party must not only object but also state the grounds for the objection "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). A general objection suffices to preserve error "only if the legal basis for the objection is obvious to the court and to opposing counsel." *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006). "When the objection is not specific, and the legal basis is not obvious, it does not serve the purpose of the contemporaneous-objection rule for an appellate court to reach the merits of a forfeitable issue that is essentially raised for the first time on appeal." *Id.* For the purpose of this analysis, we find that the basis of Juarez' objection was obvious.

each time particular testimony is offered, no reversible error is presented." *Martin*, 151 S.W.3d at 242. Here, because Juarez did not object to either Collins' continued testimony or the 9-1-1 call, we find that he failed to preserve this issue for our review.

### 2. Trial Court Did Not Abuse Discretion in Admitting Victim's Excited Utterance as Hearsay Exception

Next, Juarez argues that the trial court erred in allowing Collins to testify about statements Morcia made to her after the incident. Collins testified that Morcia was "sitting on the couch crying" when officers entered Juarez' apartment. Collins continued,

> The language line[7] had explained to us that the two had gotten into an argument and that he had choked her and he had said, bitch, get the ambulance.
> So he had pulled her hair, dragged her and brought her back. Which she felt a little embarrassed. She [did not] know [that] . . . we got there because we received a call. That was basically the situation. The offense had occurred inside of the bedroom while they -- [Morcia] had stated to me she had tried to stay at her apartment. Which they did not live together.

Juarez objected to Collins' testimony as "continuous hearsay."[8] The trial court overruled Juarez' objection and allowed him a running hearsay objection.

---

[7] Although it is not specified in the record, reading between the lines, it appears that the language line is a means through which Dallas area emergency services can communicate with non-English speakers.

[8] "As a prerequisite to presenting a complaint for appellate review," a party must have made a timely request, objection, or motion to the trial court "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A); *see Hines v. State*, 269 S.W.3d 209, 216 (Tex. App.—Texarkana 2008, pet. ref'd). A general hearsay objection does not preserve a double-hearsay issue. *Freeman v. State*, 230 S.W.3d 392, 403 (Tex. App.—Eastland 2007, pet. ref'd); *Ricketts v. State*, 89 S.W.3d 312, 319 n.1 (Tex. App.—Fort Worth 2002, pet. ref'd). It is unclear from Juarez' trial counsel's objection to "continuous hearsay" whether he was objecting to hearsay within hearsay (i.e, Collins' testimony at trial about what the language line told her about what Morcia told it) or simply to Collins' testimony about Morcia's out-of-court statement. We addressed a similarly ambiguous objection in *Martin*, 151 S.W.3d at 240, in the context of embedded hearsay, where the defendant, Martin, was charged with murder. At trial, Martin's brother, Gerald, testified that on the night of the murder, he was visiting at Martin's home when Martin arrived and Gerald told him to leave. Gerald testified that the reason he told Martin to leave was because Martin's wife had told him that Martin had "killed somebody." *Id*. We found that Martin's general hearsay objection did not preserve error as to Martin's wife's "embedded hearsay" statement to Gerald because "when the hearsay objections were made, the trial court clearly

13

We "must uphold a trial court's ruling if there is any legitimate ground for doing so." *Duren v. State*, 87 S.W.3d 719, 728 (Tex. App.—Texarkana 2002, pet. struck) (citing *Metts v. State*, 22 S.W.3d 544, 550 (Tex. App.—Fort Worth 2000, no pet.)). Rule 801 of the Texas Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d). The Rules of Evidence provide an exception to the hearsay rule for excited utterances. *See* TEX. R. EVID. 803(2). An excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.*

We have previously summarized the law governing applicability of the excited-utterance exception as follows:

> For the excited-utterance exception to apply, three conditions must be met: (1) the statement must be a product of a startling occurrence that produces a state of nervous excitement in the declarant and renders the utterance spontaneous and unreflecting, (2) the state of excitement must still so dominate the declarant's mind that there is no time or opportunity to contrive or misrepresent, and (3) the statement must relate to the circumstances of the occurrence preceding it.

*Goodman v. State*, 302 S.W.3d 462, 471–72 (Tex. App.—Texarkana 2009, pet. ref'd) (citing *Sellers v. State*, 588 S.W.2d 915, 918 (Tex. Crim. App. [Panel Op.] 1979); *Mumphrey v. State*,

---

believed counsel's concern was just about what Gerald said. At no time did counsel point out to the trial court that the real concern was over the sister-in-law's embedded hearsay statement that Martin had 'killed somebody.'" *Id.* Although we examined embedded hearsay rather than hearsay within hearsay in *Martin*, the principle is the same: trial counsel failed to specifically object to the second portion of the hearsay statement. Likewise, Juarez' objection did not inform the trial court of any double hearsay complaint. Further, the record does not demonstrate that the trial judge understood Juarez' objection as an objection to hearsay within hearsay. Thus, to the extent Juarez' brief complains of double hearsay, the issue is not preserved. We also note that no complaint about the application of the language conduit rule has been preserved. *See generally Saavedra v. State*, 297 S.W.3d 342 (Tex. Crim. App. 2009) (discussing the language conduit rule).

14

155 S.W.3d 651, 663 (Tex. App.—Texarkana 2005, pet. ref'd)). "The critical factor in determining when a statement is an excited utterance under Rule 803(2) 'is whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event.'" *Id.* at 472 (quoting *Lawton v. State*, 913 S.W.2d 542, 553 (Tex. Crim. App. 1995), *overruled on other grounds by Mosely v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998)); *see Neal v. State*, 186 S.W.3d 690, 693 (Tex. App.—Dallas 2006, no pet.). "The time elapsed between the occurrence of the event and the utterance is only one factor considered in determining the admissibility of the hearsay statement." *Goodman*, 302 S.W.3d at 472 (citing *Lawton*, 913 S.W.2d at 553). "That the declaration was a response to questions is likewise only one factor to be considered and does not alone render the statement inadmissible." *Id*. (citing *Lawton*, 913 S.W.2d at 553).

Here, the evidence established that Collins encountered Morcia mere moments after she had been the victim of a startling event. Because Collins testified that Morcia was crying during the police intervention, the trial court could find that the state of excitement still dominated Morcia's mind and that there was no time or opportunity to contrive or misrepresent the statements made to the language line about the circumstances of the occurrence. Consequently, we cannot conclude that the trial court abused its discretion in overruling Juarez' hearsay objection.[9]

Juarez' brief does not address any applicable exceptions to the hearsay rule. Rather, he writes,

---

[9]Moreover, Collins' statement was cumulative of Morcia's testimony. "[A]dmission of inadmissible evidence is harmless error if other evidence that proves the same fact that the inadmissible evidence sought to prove is admitted without objection at trial." *Broderick v. State*, 35 S.W.3d 67, 75 (Tex. App.—Texarkana 2000, pet. ref'd); *see Allen v. State*, 436 S.W.3d 815, 822 (Tex. App.—Texarkana 2014, pet. ref'd); *see also Ross v. State*, 763 S.W.2d 897, 903 (Tex. App.—Dallas 1998, pet. ref'd).

15

It is unclear from the record in Appellant's case whether the language line consisted of an actual person translating the complaining witness's statements or some sort of computerized translation program. In any event, the manner of translation is irrelevant in Appellant's case because neither a translator nor a person familiar with computerized translation testified during the trial and there is no evidence in the record that the translation was sworn.

This particular complaint was not brought before the trial court.

The point of error on appeal must comport with the objection made at trial. *See Swain v. State*, 181 S.W.3d 359, 367 (Tex. Crim. App. 2005); *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). Because Juarez' complaint on appeal concerning the language line was not asserted below, it does not comport with his objections at trial and is not preserved for our review. *See Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009).

### 3. Trial Court Did Not Abuse Discretion in Allowing Officer to Explain Her Reason for Arresting Juarez

In his last point of error related to Collins' testimony, Juarez complains of the trial court's ruling on his relevance objection:

> Q. [BY THE STATE] Would you mind explaining to the jury some of the importance family violence has had in particular with the Dallas Police Department?
>
> [BY THE DEFENSE]: Your Honor, I object to that as irrelevant.
>
> THE COURT: What's the relevance?
>
> [BY THE STATE]: Defense counsel on cross-examination said the witness is testifying solely about the defendant's size as it relates to why she made an arrest. I think it's relevant to the emphasis that the City has put on domestic violence cases in particular violence in the home. I just want her to be able to explain just a little bit about the importance of that by the City.
>
> THE COURT: Then the objections is [sic] overruled. Please continue.

16

A. [BY COLLINS] Family violence is a large, viable cause that we receive. Oftentimes it can happen on more than one occasion with the same person.

So when we're called, just as the attorney had stated, out to a location in the middle of the night, you think of it just like in my private complex, we don't want to the hear noises all night, things like that. We come in and make a decision. We want to make the best decision that's going to be for the welfare and safety of anybody.

If something were to happen when we walk away when we had responded to that call, then we would be liable for that. So we have to make sure that we go -- see what we have to do in order to do diffuse the situation.

"Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence . . . more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. Juarez argues that the City's stance on domestic violence had no bearing on any fact of consequence in Juarez' case. We examine the record to determine whether the State's explanation of its need for the evidence was related to the defensive theory.

Morcia testified that she hit Juarez in her attempt to escape his chokehold. Photographs of Juarez' injuries were shown to the jury. On direct examination, Collins, who had received special field training on responding to domestic violence cases, testified that police officers "have to determine who the aggressor is and make an arrest to prevent the furtherance or continuance of family violence." She explained that she arrested Juarez after determining that he was the primary aggressor. During his cross-examination of Collins, Juarez asked, "If you make a determination that there is some sort of disturbance and possibility of a problem, the safe thing is to arrest somebody and get them out of that situation instead of just leaving them there going off and not arresting them. Correct?" Collins responded, "Correct. But that's after the

17

investigation." Thereafter, Collins testified that the physical size of Morcia and Juarez played a role in determining that Juarez was the primary aggressor.

Whether Juarez was the primary aggressor was a fact of consequence to the case. The defensive theory was that Juarez, who sustained visible injury, was not the primary aggressor against Morcia, who did not appear to have any visible injuries. Juarez' cross-examination of Collins suggested that her investigation, which concluded that Juarez was the primary aggressor, was cursory and that her decision to arrest Juarez was based solely on his size. The State clarified that its purpose in asking the question Juarez complains of was not to elicit a moving speech on the negative effects of family violence, but (1) to explain that, due to the importance placed on family violence cases by the Dallas Police Department and the special training its officers receive, Collins' investigation was not cursory, (2) to rebut the idea that Collins arrested Juarez based solely on his size, and (3) to explain the policy and reason behind Collins' decision to arrest Juarez.

Through his cross-examination of Collins, Juarez implied that Collins merely arrested him because he was larger than Morcia, not because she believed he was the primary aggressor. If left un-rebutted, the jury could have doubted the sincerity of her belief, thereby creating doubt that Juarez was, in fact, the first aggressor. The State's evidence regarding the City's stance on family violence helped rebut that implication by giving context to Collins' decision to arrest Juarez. Therefore, the evidence was relevant to a fact of consequence in this case. We find that the trial court did not abuse its discretion in overruling Juarez' relevance objection.

We overrule Juarez' three evidentiary points of error relating to Collins' testimony.

18

**III. There Was No Abuse of Discretion In Overruling Objections to the Investigator's Testimony During Punishment**

**A. Investigator's Testimony About Immigration Hold Was Admissible**

During punishment, the State called Eraina Longoria, an investigator with the Dallas County District Attorney's Office, who testified in the following manner on direct-examination:

> Q.     [BY THE STATE] Have you had an opportunity to log into the Adult Identification System?
>
> A.     [BY LONGORIA] Yes, sir.
>
> Q.     And have you looked at the defendant, Martin Juarez, on that identification system?
>
> A.     Yes, I did.
>
> Q.     And did he go by a couple of different aliases?
>
> A.     Yes.
>
> Q.     In particular, he also has a hold in the system; is that correct?
>
> A.     Yes.[10]
>
> [BY THE DEFENSE]:  Judge, I'm going to object to hearsay.
>
> THE COURT:  Overrule.
>
> Q.     (BY [THE STATE]) What type of holds does he have?
>
> A.     It's an immigration status and ICE hold.[11]

---

[10]In its notice of extraneous offenses, the State put Juarez on notice that it intended to introduce evidence that he was illegally residing in the United States.

[11]The State does not argue that Juarez waived his hearsay objection by failing to reiterate it after the State asked what type of hold Juarez had.  Here, we decline to resolve Juarez' point of error on the basis of preservation. Redundant objections to the same matter for the same reason are not necessary if the circumstances indicate they would have been futile.  *See Graham v. State*, 710 S.W.2d 588, 591 (Tex. Crim. App. 1986); *Kelly v. State*, 321

On appeal, Juarez argues that the trial court erred in overruling his hearsay objection to Longoria's testimony because "the contents of and information in AIS[12] specifically related to [Juarez] was hearsay."[13] Longoria testified that the AIS system reported an immigration hold. "If a report contains some hearsay statement, the hearsay statement must fall under some hearsay exception of its own because neither the public records and reports exception nor the records of regularly conducted activities exception protects hearsay within hearsay." *Perry v. State*, 957 S.W.2d 894, 899–900 (Tex. App.—Texarkana 1997, pet. ref'd); *see Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.); *Philpot v. State*, 897 S.W.2d 848, 851 (Tex. App.—Dallas 1995, pet. ref'd).

The public records and reports exception to the hearsay rule allows the admission in evidence of

---

S.W.3d 583, 598 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (citing *Cardenas v. State*, 787 S.W.2d 160, 162 (Tex. App.—Houston [1st Dist.] 1990, pet. ref'd)).

[12]The term AIS is not defined in the appellate record. However, Juarez defines the term AIS as Adult Information Systems in his brief.

[13]Juarez did not timely object to Longoria's testimony regarding Juarez' aliases. Further, during guilt/innocence, Collins had already testified, without objection, about Juarez' use of aliases, as demonstrated in the following excerpt:

> A.     . . . . If you don't have a physical ID, they do a life scan. That identifies that person; who they are. We didn't have any ID for the AP, Mr. Juarez, so we ended up doing a life scan at the jail, which came back as Nicanor Sanchez.
> Q.     So if I understand you correctly, Officer Collins, inside of the reports both names are used, but both of those names are, in fact, the same individual sitting in court with us. Is that correct?
> A.     Yes, it is.
> Q.     You didn't determine his true name or the alias name until you actually did the life scan at the jail.
> A.     Correct, sir.

Thus, we find that Juarez has not preserved any complaint relating to Longoria's testimony regarding his aliases. *See* TEX. R. APP. P. 33.1(a)(1); *Long*, 10 S.W.3d at 399.

> [r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies setting forth: . . . . (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, . . . matters observed by police officers and other law enforcement personnel, . . . unless the sources of information or other circumstances indicate a lack of trustworthiness.

TEX. R. EVID. 803(8).[14]  "Rule 803(8) presumes admissibility, and the party opposing the report's admission must prove the report's untrustworthiness." *Lozano v. State*, 359 S.W.3d 790, 818 (Tex. App.—Fort Worth 2012, pet. ref'd).  "The general policy behind this exception is that public records and reports are inherently reliable because of the presumptions that officers will perform their duties, that officers lack a motive to make false reports, and that public inspection of the reports will disclose inaccuracies." *Perry*, 957 S.W.2d at 897.

Under Rule 803(8)(B), official reports are not admissible if they contain "matters observed by police officers and other law enforcement personnel." TEX. R. EVID. 803(8)(B). "This limitation is based on the presumption that observations by an officer at a scene of a crime are not as reliable as observations by other public officials . . . due to the adversarial nature of the confrontation between the defendant and the police in the criminal context." *Perry*, 957 S.W.2d at 898–99 (citations omitted).

Yet, despite Rule 803(8)(B)'s limitation, not all law enforcement reports are inadmissible. *Smith v. State*, 895 S.W.2d 449, 455 (Tex. App.—Dallas 1995, pet. ref'd) (citing *Cole v. State*, 839 S.W.2d 798, 804–05, 809–10 (Tex. Crim. App. 1990) (op. on reh'g) (per curiam)).  An example of a public record that falls under the Rule 803(8)(B) exception is a

---

[14]Under Rule 803(8)(A), records that a public agency keeps of its own activities are admissible. TEX. R. EVID. 803(8)(A).  Under this exception, the Fort Worth Court of Appeals held that a criminal case list printed from a district attorney's office computer constituted a public record that was admissible over a hearsay objection. *Watson v. State*, 917 S.W.2d 65, 67 (Tex. App.—Fort Worth 1996, pet. ref'd).  Here, the AIS system compiled records kept both by the district attorney's office and the United States Department of Homeland Security.

driving record because a document of this nature records "'routine, objective observations, made as part of the everyday function of the'" Department of Public Safety and contains "ministerial, objective observations of an unambiguous factual nature." *Id.* (quoting *Cole*, 839 S.W.2d at 804–05; *Tanner v. State*, 875 S.W.2d 8, 9 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd)); *see Perry*, 957 S.W.2d at 899. Moreover, "[t]he fact that an individual's driving record may be used in a criminal prosecution does not implicate the same concern of unreliability involved when reports are prepared in contemplation of litigation." *Smith*, 895 S.W.2d at 455.

To determine whether Longoria's testimony about Juarez' immigration status falls into the Rule 803(8)(B) exception, "[w]e may look to federal cases that interpret the Federal Rules of Evidence for guidance as to the scope and applicability of the Texas Rules of Criminal Evidence because our rules were patterned after the federal rules." *Perry*, 857 S.W.2d at 897; *see Cole*, 839 S.W.2d at 801. In *United States v. Hernandez-Rojas*, the United States Court of Appeals for the Ninth Circuit found that the purpose behind Rule 803(8)(B)'s exclusion of matters observed by law enforcement personnel was inapplicable to a warrant of deportation because (1) "the notation that [the defendant] was deported to Mexico was a ministerial, objective observation, which has inherent reliability because of the Government's need to keep accurate records of the movement of aliens" and (2) the record had "none of the features of the subjective report made by a law enforcement official in an on-the-scene investigation, which . . . lack[s] sufficient guarantees of trustworthiness because they are made in an adversary setting and likely to be used in litigation." *United States v. Hernandez-Rojas*, 617 F.2d 533, 535 (9th Cir. 1980). In reaching the same conclusion, the Fifth Circuit discussed *Hernandez-Rojas* and also decided that a

warrant of deportation was admissible under Rule 803(8)(B). *United States v. Quezada*, 754 F.2d 1190, 1193–94 (5th Cir. 1985). Both *Hernandez-Rojas* and *Quezada* have been cited by Texas courts with favor. *Fischer v. State*, 252 S.W.3d 375, 382, n.29 (Tex. Crim. App. 2008); *Pondexter v. State*, 942 S.W.2d 577, 585 (Tex. Crim. App. 1996); *Cole*, 839 S.W.2d at 803–04.

Here, we find that the trial court could have concluded (1) that the AIS system's report was similar to a driving record in that it documented routine, objective observations made as a part of the agency's everyday function and (2) that the AIS system's report that Juarez had an immigration hold was "information [of] 'ministerial, objective observations of an unambiguous factual nature.'" *Smith*, 895 S.W.2d at 455 (quoting *Cole*, 839 S.W.2d at 804–05). Accordingly, we find that the trial court did not abuse its discretion in admitting Longoria's testimony.

### A.     Speculation Objection Was Not Preserved

After Longoria testified that Juarez had an immigration hold, the State asked Longoria to interpret the meaning of the hold, as demonstrated by this excerpt:

> Q.     What does that alert you to, if anything?
>
> A.     That he's not a legal U.S. citizen or legal resident of the United States.
>
> Q.     And are you familiar with kind of what -- what does that mean? Was [sic] does that sign [sic] to you as an investigator --
>
> A.     That he will be deported.
>
> [BY THE DEFENSE]:  Judge, I object to that as being speculation --
>
> THE COURT:  You'll have a chance to exercise your right to cross-examine this defendant as to whether or not she's an expert.  Overrule.

Juarez chose not to cross-examine Longoria. However, he argues that Longoria's testimony that he would be deported was speculative because the State failed to establish that Longoria had the personal knowledge to interpret the hold status.

Before the State asked the objectionable question, Longoria had already testified that Juarez was not a legal citizen or resident of the United States. Longoria also testified that Juarez would be deported before the speculation objection was raised. A party's objection must be timely in order to preserve error. *See* TEX. R. APP. P. 33.1(a)(1). "If a party 'fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely and error is waived.'" *Grant v. State*, 345 S.W.3d 509, 512 (Tex. App.—Waco 2011, pet. ref'd) (quoting *Dinkins v. State*, 894 S.W.2d 330, 355 (Tex. Crim. App. 1995)); *see Irving v. State*, No. 05-12-00221-CR, 2013 WL 2297075, at *8 (Tex. App.—Dallas May 23, 2013, pet. ref'd) (mem. op., not designated for publication)). Here, because Juarez does not explain the delay in asserting his speculation objection, we find his objection untimely and overrule his last point of error relating to the trial court's evidentiary rulings.[15]

## IV.    We Modify the Judgment to Reflect the Correct Statute of Offense

The Texas Rules of Appellate Procedure give this Court authority to modify judgments to make the record speak the truth when the matter has been called to our attention by any source. TEX. R. APP. P. 43.2; *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Rhoten v.*

---

[15]Further, we note that the jury's guilty verdict subjected Juarez to mandatory deportation. *See* 8 U.S.C.A. §§ 1227(a)(2)(A)(iii), 1101(a)(43)(F), (a)(48)(A) (West, Westlaw through P.L. 113-296 (excluding P.L. 113-235, 113-287, and 113-291) approved Dec. 19, 2014).

24

*State*, 299 S.W.3d 349, 356 (Tex. App.—Texarkana 2009, no pet.); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd).

While the trial court's judgment correctly described the offense for which Juarez was convicted, the judgment incorrectly lists the statute for the offense as Section 22.02 of the Texas Penal Code, which sets forth the elements of aggravated assault. *See* TEX. PENAL CODE ANN. § 22.02 (West 2011). Our review of the record shows that the correct statute for the offense is Section 22.01(b)(2)(B) of the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 22.01(b)(2)(B). The State concedes the mistake.

We find that Juarez' suggested modification of the trial court's judgment is necessary to make the record speak the truth. TEX. R. APP. P. 43.2; *French*, 830 S.W.2d at 609; *Smith v. State*, No. 05-10-01642-CR, 2012 WL 2926201, at *3 (Tex. App.—Dallas July 19, 2012, pet. ref'd) (not designated for publication). Therefore, we hereby modify the judgment to indicate that the statute under which Juarez was convicted is Section 22.01(b)(2)(B) of the Texas Penal Code.

## V.       Conclusion

We affirm the judgment of the trial court, as modified.


Ralph K. Burgess
Justice

Date Submitted:      January 21, 2015
Date Decided:        March 24, 2015

Publish

25